Scott S. Thomas, Bar No. 21-275
sst@paynefears.com
Sarah J. Odia, Bar No. 21-279
sjo@paynefears.com
PAYNE & FEARS LLP
4 Park Plaza, Suite 1100
Irvine, California 92614
Phone (949) 851-1100
Fax (949) 851-1212
Telephone: 949-851-1100
Facsimile: 602-344-9653

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| PULTE HOMES OF NEW MEXICO, INC., a Michigan corporation; PULTE DEVELOPMENT NEW MEXICO, INC., a Michigan corporation, | CIVIL NO. |
| Plaintiffs, | PLAINTIFFS' COMPLAINT |
| v. | JURY DEMAND |
| THE CINCINNATI INSURANCE COMPANY, an Ohio corporation; UNITED SPECIALTY INSURANCE COMPANY, a Delaware corporation; SENTINEL INSURANCE COMPANY, LTD., a Connecticut corporation; GUIDEONE NATIONAL INSURANCE COMPANY, an Iowa corporation; PELEUS INSURANCE COMPANY, a Virginia corporation; THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY, a Delaware corporation; ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation; CENTRAL MUTUAL INSURANCE COMPANY, an Ohio corporation; CLEAR BLUE SPECIALTY INSURANCE COMPANY, a Texas corporation; KNIGHT SPECIALTY INSURANCE COMPANY, a Delaware corporation; STARR SURPLUS LINES | |

INSURANCE COMPANY, a Texas
corporation; ACUITY A MUTUAL
INSURANCE COMPANY, a Wisconsin
corporation; FEDERATED MUTUAL
INSURANCE COMPANY, a Minnesota
corporation; NAVIGATORS SPECIALTY
INSURANCE COMPANY, a New York
corporation; SWISS RE CORPORATE
SOLUTIONS ELITE INSURANCE
CORPORATION fka NORTH AMERICAN
ELITE INSURANCE COMPANY, a New
Hampshire corporation; EVEREST
PREMIER INSURANCE COMPANY, a
Delaware corporation; GEMINI
INSURANCE COMPANY, a Delaware
corporation; SELECTIVE INSURANCE
COMPANY OF AMERICA, a New Jersey
corporation; TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA, a
Connecticut corporation,

                    Defendants.

## PLAINTIFF'S COMPLAINT

## JURY DEMAND

Plaintiffs Pulte Homes of New Mexico, Inc.  and Pulte Development New Mexico, Inc.,

(collectively "Pulte" or "Plaintiffs") hereby allege as follows:

## PARTIES

1.     At all times mentioned herein, PULTE HOMES OF NEW MEXICO, INC. was

and is a Michigan corporation, authorized to do business in the State of New Mexico, with its

principal place of business in Georgia.

2.     At all times mentioned herein, PULTE DEVELOPMENT NEW MEXICO, INC.

was and is a Michigan corporation, authorized to do business in the State of New Mexico, with

its principal place of business in Georgia.

3.      Plaintiffs are informed and believe, and on that basis allege, that THE CINCINNATI INSURANCE COMPANY ("CIC") was and is an Ohio corporation with its principal place of business in Ohio. Upon information and belief, CIC is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

4.      Plaintiffs are informed and believe, and on that basis allege, that UNITED SPECIALTY INSURANCE COMPANY ("USIC") was and is a Delaware corporation with its principal place of business in Texas. Upon information and belief, USIC is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

5.      Plaintiffs are informed and believe, and on that basis allege, that SENTINEL INSURANCE COMPANY, LTD. ("Sentinel") was and is a Connecticut corporation with its principal place of business in Connecticut. Upon information and belief, Sentinel is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

6.      Plaintiffs are informed and believe, and on that basis allege, that GUIDEONE NATIONAL INSURANCE COMPANY ("GuideOne") was and is an Iowa corporation with its principal place of business in Iowa. Upon information and belief, GuideOne is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

7.      Plaintiffs are informed and believe, and on that basis allege, that PELEUS INSURANCE COMPANY ("Peleus") was and is a Virginia corporation with its principal place of business in Virginia. Upon information and belief, Peleus is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

8.      Plaintiffs are informed and believe, and on that basis allege, that CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY ("Cincinnati Specialty") was and is a Delaware corporation with its principal place of business in Ohio. Upon information and belief, Cincinnati Specialty is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

9.      Plaintiffs are informed and believe, and on that basis allege, that ACE AMERICAN INSURANCE COMPANY ("ACE") was and is a Pennsylvania corporation with its principal place of business in Pennsylvania. Upon information and belief, ACE is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

10.     Plaintiffs are informed and believe, and on that basis allege, that CENTRAL MUTUAL INSURANCE COMPANY ("Central Mutual") was and is an Ohio corporation with its principal place of business in Ohio. Upon information and belief, Central Mutual is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

PLAINTIFF'S COMPLAINT

11.     Plaintiffs are informed and believe, and on that basis allege, that CLEAR BLUE SPECIALTY INSURANCE COMPANY ("Clear Blue") was and is a Texas corporation with its principal place of business in Puerto Rico. Upon information and belief, Clear Blue is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

12.     Plaintiffs are informed and believe, and on that basis allege, that KNIGHT SPECIALTY INSURANCE COMPANY ("KSIC") was and is a Delaware corporation with its principal place of business in California. Upon information and belief, KSIC is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

13.     Plaintiffs are informed and believe, and on that basis allege, that STARR SURPLUS LINES INSURANCE COMPANY ("Starr") was and is an Illinois corporation with its principal place of business in New York. Upon information and belief, Starr is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

14.     Plaintiffs are informed and believe, and on that basis allege, that ACUITY, A MUTUAL INSURANCE COMPANY ("Acuity") was and is a Wisconsin corporation with its principal place of business in Wisconsin. Upon information and belief, Acuity is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

15.     Plaintiffs are informed and believe, and on that basis allege, that FEDERATED MUTUAL INSURANCE COMPANY ("Federated") was and is a Minnesota corporation with its principal place of business in Minnesota. Upon information and belief, Federated is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

16.     Plaintiffs are informed and believe, and on that basis allege, that NAVIGATORS INSURANCE COMPANY ("Navigators") was and is a New York corporation with its principal place of business in Connecticut. Upon information and belief, Navigators is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

17.     Plaintiffs are informed and believe, and on that basis allege, that SWISS RE CORPORATE SOLUTIONS ELITE INSURANCE CORPORATION fka NORTH AMERICAN ELITE INSURANCE COMPANY ("Swiss Re") was and is a Missouri corporation with its principal place of business in Missouri. Upon information and belief, Swiss Re is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

18.     Plaintiffs are informed and believe, and on that basis allege, that EVEREST PREMIER INSURANCE COMPANY ("Everest") was and is a Delaware corporation with its principal place of business in New Jersey. Upon information and belief, Everest is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

19.     Plaintiffs are informed and believe, and on that basis allege, that GEMINI INSURANCE COMPANY ("Gemini") was and is a Delaware corporation with its principal place of business in Arizona. Upon information and belief, Gemini is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

20.     Plaintiffs are informed and believe, and on that basis allege, that SELECTIVE INSURANCE COMPANY OF AMERICA ("Selective") was and is a New Jersey corporation with its principal place of business in New Jersey. Upon information and belief, Selective is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

21.     Plaintiffs are informed and believe, and on that basis allege, that TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA ("Travelers") was and is a Connecticut corporation with its principal place of business in Connecticut. Upon information and belief, Travelers is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

22.     Plaintiffs are informed and believe, and on that basis allege, that AMERICAN HALLMARK INSURANCE COMPANY OF TEXAS ("Hallmark") was and is a Texas corporation with its principal place of business in Texas. Upon information and belief, Hallmark is and was at all times mentioned herein eligible to do business as an insurer in the State of New Mexico, and may be served with this Complaint by and through the Superintendent of Insurance of the State of New Mexico pursuant to Section 59A-5-32 NMSA 1978.

/ / /

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this action founded on diversity of citizenship pursuant 28 U.S.C. § 1332, because the matters in controversy exceed $75,000.00 per defendant, exclusive of interest and costs, and because complete diversity exists between Pulte and Defendants.

24.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**The Estates at Mirehaven Project**

25.     Pulte is a homebuilder that participated in the construction of a residential project known as The Estates at Mirehaven community (the "Project"), which is located in Albuquerque, New Mexico.

26.     Pulte performed no work on the Project; instead, subcontractors performed all of the work.

27.     A Management Corporation d/b/a Amestoy Stucco and Amestoy Dri-Wall ("A Management") subcontracted with Pulte to, among other things, perform stucco and drywall work and install stucco systems at the Project.

28.     Aldermill, Inc. ("Aldermill") subcontracted with Pulte to, among other things, perform trim carpentry work and to paint the exterior and interior portions of the homes on the Project.

29.     Alvarez Drywall, Inc. ("Alvarez Drywall") subcontracted with Pulte to, among other things, perform drywall work and install drywall systems on the Project.

30.     Armstrong General Contractors, Inc. ("Armstrong") subcontracted with Pulte to, among other things, perform drywall work and install drywall systems on the Project.

31.     Artisan Stucco, Inc. ("Artisan Stucco") subcontracted with Pulte to, among other things, perform stucco and stone work and to install stucco systems on the Project.

32.     Aspen Block, LLC ("Aspen Block") subcontracted with Pulte to, among other things, install fences and walls on the Project.

33.     Aspen Construction, LLC ("Aspen Construction") subcontracted with Pulte to, among other things, perform flatwork, foundation, and stucco work on the Project.

34.     Bullseye Painting Company, LLC ("Bullseye") subcontracted with Pulte to, among other things, perform interior and exterior painting on the Project.

35.     Chaparral Materials, Inc. ("Chaparral") subcontracted with Pulte to, among other things, perform drywall work and to install window systems on the Project.

36.     Chavez Lath & Plaster, Inc. ("Chavez L&P") subcontracted with Pulte to, among other things, perform lath and plaster work and to install stucco systems and stone on the Project.

37.     Chavez Roofing Corporation ("Chavez Roofing") subcontracted with Pulte to, among other things, perform roofing work and install roofing systems on the Project.

38.     Custom Grading, Inc. ("Custom Grading") subcontracted with Pulte to, among other things, perform grading work on the project.

39.     Form-Cove Manufacturing Co. ("Form-Cove") subcontracted with Pulte to, among other things, install laminate and marble countertops on the Project.

40.     Haskins Electric, LLC ("Haskins") subcontracted with Pulte to, among other things, perform electrical work on the Project.

41.     ISI Design and Installation Solutions, Inc. f/k/a Creative Touch Interiors, Inc. ("ISI Design") subcontracted with Pulte to, among other things, perform flooring work and install tile and carpet flooring systems on the Project.

42.     Magnum Builders of New Mexico, Inc., f/k/a Magnum Builders, LLC ("Magnum") subcontracted with Pulte to, among other things, perform framing work on the Project.

43.     Otero & Sons Roofing Corp. ("Otero") subcontracted with Pulte to, among other things, perform roofing work and install roofing systems on the Project.

44.     Superior Stormwater Services, LLC ("Superior") subcontracted with Pulte to, among other things, perform grading work on the Project.

45.     Williams Drywall, Inc. ("Williams Drywall") subcontracted with Pulte to, among other things, perform drywall work and install drywall systems on the Project.

**The CIC Policies**

46.     A Management, Aspen Block, Aspen Construction, Custom Grading, and Williams Drywall performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

47.     Each subcontract required A Management, Aspen Block, Aspen Construction, Custom Grading, and Williams Drywall to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

48.     A Management, Aspen Block, Aspen Construction, Custom Grading, and Williams Drywall obtained commercial general liability policies from CIC (the "CIC Policies"):

| Insurer | Policy Number(s) | Policy Period(s) | Named Insured | Additional Insured |
|---------|------------------|------------------|---------------|--------------------|
| CIC | EPP0369125 | 01/01/16 – 04/01/19 | A Management | Pulte |
| CIC | EPP0118587 | 01/01/16 – 01/01/19 | Aspen Block | Pulte |
| CIC | EPP0058469 | 11/01/15 – 11/01/18 | Aspen Construction | Pulte |
| CIC | EPP0129000 | 03/01/13 – 03/01/19 | Custom Grading | Pulte |
| CIC | EPP0181746 | 03/07/13 – 03/07/19 | Williams Drywall | Pulte |

49.     The CIC Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of A Management's, Aspen Block's, Aspen Construction's, Custom Grading's, and Williams Drywall's work.

50.     The coverage afforded under the CIC Policies requires Defendant CIC to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of A Management's, Aspen Block's, Aspen Construction's, Custom Grading's, and Williams Drywall's work or operations.

**The USIC Policies**

51.     A Management, Aspen Block, Chavez L&P, Chavez Roofing, Haskins, Magnum, Otero, and Williams Drywall performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

52.     Each subcontract required A Management, Aspen Block, Chavez L&P, Chavez Roofing, Haskins, Magnum, Otero, and Williams Drywall to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

53.     A Management, Aspen Block, Chavez L&P, Chavez Roofing, Haskins, Magnum, Otero, and Williams Drywall obtained commercial general liability policies from USIC (the "USIC Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|--------------|---------------|---------------|--------------------|
| USIC | LIG0049300 | 04/-1/19 – 04/1/20 | A Management | Pulte |
|  | ATN2027209 | 12/6/20 – 12/6/21 |  |  |
|  | ATN2139961 | 12/6/21 – 12/6/22 |  |  |

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| USIC | ATNATL1811742<br>ATN2025620 | 01/01/19 – 01/01/20<br>01/01/20 – 01/01/21 | Aspen Block | Pulte |
| USIC | USA4000819<br>USA4000820<br>USA4080248<br>USA4073431 | 03/01/14 – 03/01/15<br>03/01/14 – 03/01/15<br>03/01/15 – 03/01/16<br>03/01/15 – 03/01/16 | Chavez L&P | Pulte |
| USIC | BTO1517426 | 01/01/15 – 01/01/16 | Chavez Roofing | Pulte |
| USIC | BTO1426956<br>BTO1648383<br>ATN-SF1750764 | 07/01/14 – 07/01/15<br>07/01/16 – 07/01/17<br>07/01/17 – 07/01/18 | Haskins | Pulte |
| USIC | ATN-SF1711155<br>ATN-SF1823290<br>ATN1935288 | 10/21/17 – 10/21/18<br>10/21/18 – 10/21/19<br>10/21/19 – 10/21/10 | Magnum | Pulte |
| USIC | KSVENA160035204<br>KSVENX162255203<br>ATNATL1750057<br>BTN1753672<br>ATN2117319 | 01/01/16 – 01/01/17<br>01/01/16 – 01/01/17<br>01/01/17 – 01/01/19<br>01/01/17 – 01/01/19<br>01/01/21 – 01/01/22 | Otero | Pulte |
| USIC | LIG0048000<br>LIG0048001 | 03/07/19 – 03/07/20<br>03/07/20 – 03/07/21 | Williams Drywall | Pulte |

54.     The USIC Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of A Management's, Aspen Block's, Chavez L&P's, Chavez Roofing's, Haskins', Magnum's, Otero's, and Williams Drywall's work.

55.     The coverage afforded under the USIC Policies requires Defendant USIC to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of A Management's, Aspen Block's, Chavez L&P's, Chavez Roofing's, Haskins', Magnum's, Otero's, and Williams Drywall's work or operations.

**The Sentinel Policies**

56.     Aldermill, Alvarez Drywall, and Artisan Stucco performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

57.     Each subcontract required Aldermill, Alvarez Drywall, and Artisan Stucco to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

58.     Aldermill, Alvarez Drywall, and Artisan Stucco obtained commercial general liability policies from Sentinel (the "Sentinel Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Sentinel | 34SBAIW4643  34SBAIJ6131 | 04/10/15 – 04/10/17  02/25/17 – 02/25/21 | Aldermill | Pulte |
| Sentinel | 34SBAPL6910  34SBAIK5300 | 02/21/12 – 01/01/18  01/01/18 – 01/01/19 | Alvarez Drywall | Pulte |
| Sentinel | 34SBAZN9314 | 02/12/11 – 02/26-14 | Artisan Stucco | Pulte |

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| | 34SBAPP4428 | 02/26/14 – 02/26/22 | | |

59.    The Sentinel Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Aldermill's, Alvarez Drywall's, and Artisan Stucco's work.

60.    The coverage afforded under the Sentinel Policies requires Defendant Sentinel to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Aldermill's, Alvarez Drywall's, and Artisan Stucco's work or operations.

**The GuideOne Policies**

61.    Aldermill and Williams Drywall each performed work at the Project pursuant to one or more written subcontracts that they entered into with Pulte.

62.    Each subcontract required Aldermill and Williams Drywall to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

63.    Aldermill and Williams Drywall obtained commercial general liability policies from GuideOne (the "GuideOne Policies"):

| Insurer | Policy Number(s) | Policy Period(s) | Named Insured | Additional Insured |
|---|---|---|---|---|
| GuideOne | 56300313-00<br>56300313-01 | 02/25/21 – 02/25/22<br>02/25/22 – 02/25/23 | Aldermill | Pulte |

| Insurer | Policy Number(s) | Policy Period(s) | Named Insured | Additional Insured |
|---------|-----------------|------------------|---------------|--------------------|
| GuideOne | 563000327-00<br>563000327-01 | 03/07/21 – 03/07/22<br>03/07/22 – 03/07/23 | Williams Drywall | Pulte |

64.     The GuideOne Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Aldermill's and Williams Drywall's work.

65.     The coverage afforded under the GuideOne Policies requires Defendant GuideOne to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Aldermill and Williams Drywall's work or operations.

**The Peleus Policies**

66.     Aspen Construction and Chavez Roofing performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

67.     Each subcontract required Aspen Construction and Chavez Roofing to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

68.     Aspen Construction and Chavez Roofing obtained commercial general liability policies from Peleus (the "Peleus Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Peleus | 103GL002628100<br>AUX419523500 | 11/01/18 – 11/01/19<br>11/01/18 – 11/01/19 | Aspen Construction | Pulte |

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| Peleus | 103GL0021470-00 | 01/01/18 – 01/01/19 | Chavez Roofing | Pulte |

69.    The Peleus Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Aspen Construction's and Chavez Roofing's work.

70.    The coverage afforded under the Peleus Policies requires Defendant Peleus to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Aspen Construction's and Chavez Roofing's work or operations.

**The Cincinnati Specialty Policies**

71.    Bullseye performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

72.    Each subcontract required Bullseye to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

73.    Bullseye obtained commercial general liability policies from Cincinnati Specialty (the "Cincinnati Specialty Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| Cincinnati Specialty | CSU0049483<br>CSU0049483 | 07/26/14 – 07/26/15<br>07/26/15 – 07/26/16 | Bullseye | Pulte |

74.    The Cincinnati Specialty Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Bullseye's work.

75.     The coverage afforded under the Cincinnati Specialty Policies requires Defendant Cincinnati Specialty to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Bullseye's work or operations.

**The ACE Policies**

76.     Chaparral performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

77.     Each subcontract required Chaparral to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

78.     Chaparral obtained commercial general liability policies from ACE (the "ACE Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| ACE | HDOG274O5022 | 04/30/16 – 04/30/17 | Chaparral | Pulte |
| | HDOG46770900 | 04/30/18 – 04/30/19 | | |
| | HDOG71234459 | 04/30/19 – 04/30/20 | | |
| | HDOG71573217 | 04/30/20 – 04/30/21 | | |

79.     The ACE Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Chaparral's work.

80.     The coverage afforded under the ACE Policy requires Defendant ACE to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Chaparral's work or operations.

**The Central Mutual Policies**

81.     Form-Cove performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

82.     Each subcontract required Form-Cove to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

83.     Form-Cove obtained commercial general liability policies from Central Mutual (the "Central Mutual Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Central Mutual | CLP9579802 | 04/01/16 – 04/01/20 | Form-Cove | Pulte |
|  | CXS9579803 | 04/01/16 – 04/01/20 |  |  |

84.     The Central Mutual Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Form-Cove's work.

85.     The coverage afforded under the Central Mutual Policies requires Defendant Central Mutual to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Form-Cove's work or operations.

**The Clear Blue Policy**

86.     Otero performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

87.     Each subcontract required Otero to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000

general aggregate, and $2,000,000 products/completed operations aggregate, and to name Pulte and its affiliates as additional insureds under those insurance policies.

88.    Otero obtained a commercial general liability policy from Clear Blue (the "Clear Blue Policy"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Clear Blue | AR01-RS-200121200 | 01/01/20 – 01/01/21 | Otero | Pulte |

89.    The Clear Blue Policy was endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Otero's work.

90.    The coverage afforded under the Clear Blue Policy requires Defendant Clear Blue to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Otero's work or operations.

**The KSIC Policies**

91.    Haskins and Otero performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

92.    Each subcontract required Haskins and Otero to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

93.    Haskins and Otero obtained commercial general liability policies from KSIC (the "KSIC Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| KSIC | KSVENS151128002 | 07/01/15 – 07/01/16 | Haskins | Pulte |

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| KSIC | KSVENA160035204 | 01/01/16 – 01/01/17 | Otero | |
| | KSVENX162255203 | 01/01/16 – 01/01/17 | | |

94.     The KSIC Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Haskins' and Otero's work.

95.     The coverage afforded under the KSIC Policies requires Defendant KSIC to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Haskins' and Otero's work or operations.

**The Starr Policies**

96.     ISI Design performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

97.     Each subcontract required ISI Design to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

98.     ISI Design obtained commercial general liability policies from Starr (the "Starr Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Starr | 1000025503161 | 05/15/16 – 05/15/17 | ISI Design | Pulte |
| | 1000025503171 | 05/15/17 – 05/15/18 | | |
| | 1000025503181 | 05/15/18 – 05/15/19 | | |

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| | 1000585113181 | 05/15/18 – 05/15/19 | | |
| | 1000025650181 | 11/15/18 – 11/15/19 | | |
| | 1000585410181 | 11/15/18 – 11/15/19 | | |

99.    The Starr Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of ISI Design's work.

100.    The coverage afforded under the Starr Policies requires Defendant Starr to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of ISI Design's work or operations.

**The Acuity Policy**

101.    Armstrong performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

102.    Each subcontract required Armstrong to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

103.    Armstrong obtained a commercial general liability policy from Acuity (the "Acuity Policy"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---|---|---|---|---|
| Acuity | X49181 | 09/01/12 – 09/01/18 | Armstrong | Pulte |

104.    The Acuity Policy was endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Armstrong's work.

105.    The coverage afforded under the Acuity Policy requires Defendant Acuity to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Armstrong's work or operations.

**The Federated Policies**

106.    Armstrong performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

107.    Each subcontract required Armstrong to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

108.    Armstrong obtained commercial general liability policies from Federated (the "Federated Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Federated | 9363350<br>9363351 | 10/01/17 – 10/01/19<br>10/01/17 – 10/01/19 | Armstrong | Pulte |

109.    The Federated Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Armstrong's work.

110.    The coverage afforded under the Federated Policies requires Defendant Federated to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Armstrong's work or operations.

**The Navigators Policies**

111.     Aspen Block performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

112.     Each subcontract required Aspen Block to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

113.     Aspen Block obtained commercial general liability policies from Navigators (the "Navigators Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Navigators | HO19EXCZ00ZGJIC HO20EXCZ00ZGJIC | 01/01/19 – 01/01/20 01/01/20 – 01/01/21 | Aspen Block | Pulte |

114.     The Navigators Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Aspen Block's work.

115.     The coverage afforded under the Navigators Policies requires Defendant Navigators to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Aspen Block's work or operations.

**The Swiss Re Policy**

116.     Chaparral performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

117.     Each subcontract required Chaparral to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000

general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

118.    Chaparral obtained a commercial general liability policy from N.A. Elite (the "Swiss Re Policy"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Swiss Re | UMB200052800 | 04/30/16 – 04/30/17 | Chaparral | Pulte |

119.    The Swiss Re Policy was endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Chaparral's work.

120.    The coverage afforded under the Swiss Re Policy requires Defendant Swiss Re to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Chaparral's work or operations.

**The Everest Policies**

121.    Chaparral performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

122.    Each subcontract required Chaparral to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

123.    Chaparral obtained commercial general liability policies from Everest (the "Everest Policies"):

/ / /

/ / /

/ / /

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Everest | RM5GL00052-211 | 04/30/21 – 04/30/22 | Chaparral | Pulte |
|  | RM5GL00052-221 | 04/30/22 – 04/30/23 |  |  |
|  | RM5GL00052-231 | 04/30/23 – 04/30/24 |  |  |

124.    The Everest Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Chaparral's work.

125.    The coverage afforded under the Everest Policies requires Defendant Everest to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Chaparral's work or operations.

**The Gemini Policy**

126.    Chavez Roofing performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

127.    Each subcontract required Chavez Roofing to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

128.    Chavez Roofing obtained commercial general liability policies from Gemini (the "Gemini Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Gemini | VNGP001197 | 01/01/16 – 01/01/17 | Chavez Roofing | Pulte |
|  | VNGP001304 | 01/01/17 – 01/01/18 |  |  |

129.    The Gemini Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Chavez Roofing's work.

130.    The coverage afforded under the Gemini Policies requires Defendant Gemini to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Chavez Roofing's work or operations.

**The Selective Policy**

131.    Custom Grading performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

132.    Each subcontract required Custom Grading to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

133.    Custom Grading obtained a commercial general liability policy from Selective (the "Selective Policy"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Selective | S2304541-00 | 03/01/19 – 03/01/20 | Custom Grading | Pulte |

134.    The Selective Policy was endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Custom Grading's work.

135.    The coverage afforded under the Selective Policy requires Defendant Selective to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Custom Grading's work or operations.

**The Travelers Policy**

136.    Custom Grading performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

137.    Each subcontract required Custom Grading to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

138.    Custom Grading obtained a commercial general liability policy from Travelers (the "Travelers Policy"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Travelers | ZUP-41N07994-19-NF | 03/01/19 – 03/01/20 | Custom Grading | Pulte |

139.    The Travelers Policy was endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Custom Grading's work.

140.    The coverage afforded under the Travelers Policy requires Defendant Travelers to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Custom Grading's work or operations.

**The Hallmark Policies**

141.    Superior performed work at the Project pursuant to one or more written subcontracts that it entered into with Pulte.

142.    Each subcontract required Superior to maintain commercial general liability insurance with minimum limits of $1,000,000 combined single limit per occurrence, $2,000,000

general aggregate, and $2,000,000 products/completed operations aggregate, to name Pulte and its affiliates as additional insureds under those policies.

143.   Superior obtained commercial general liability policies from Hallmark (the "Hallmark Policies"):

| Insurer | Policy Number | Policy Period | Named Insured | Additional Insured |
|---------|---------------|---------------|---------------|--------------------|
| Hallmark | 44-CL-467509-04 | 01/02/15 – 01/02/16 | Superior | Pulte |
|  | 44-CL-467609-05 | 01/02/16 – 01/02/17 |  |  |
|  | 44-CL-467509-06 | 01/02/17 – 01/02/18 |  |  |
|  | 44-CL-467509-07 | 01/02/18 – 01/02/19 |  |  |
|  | 44-CL-467509-08 | 01/02/19 – 01/02/20 |  |  |
|  | 44-CL-467509-09 | 01/02/20 – 01/02/21 |  |  |

144.   The Hallmark Policies were endorsed to cover Pulte as an "additional insured" with respect to liability arising out of Superior's work.

145.   The coverage afforded under the Hallmark requires Defendant Hallmark to defend and indemnify Pulte against all claims that allege (duty to defend) and result in (duty to indemnify) liability for covered property damage or bodily injury arising out of Superior's work or operations.

**The *Boettcher/Adams* Claims**

146.   On or around January 16, 2023, homeowners in the Mirehaven community served a notice of alleged defects, alleging property damage to their homes as a result of defective construction, including but not limited to, property damage to and arising out from the construction and assembly of the building envelopes, slabs, roofs, walls, framings, plumbing, electrical, grading, and numerous damages from building movement.

147.     On or around June 2, 2023, homeowners in the Mirehaven community served a demand for arbitration with the American Arbitration Association, Case No. 01-23-0002-8748 entitled *Jon & Azucena Boettcher, et al. v. Pulte Homes of New Mexico, Inc., et al.* ("*Boettcher*") alleging property damage to and arising out of from the construction of building envelopes, slabs, roofs, walls, framings, plumbing, electrical, grading, and numerous damages from building movement.

148.     The *Boettcher* claimants seek damages from Pulte for property damage arising out of the work, operations and/or ongoing operations of the Defendant insurers' named insured contractors listed herein.

149.     As a result of the *Boettcher* claim, Pulte has incurred and will continue to incur significant costs, including but not limited to, forensic, investigative, and repair costs, attorneys' fees, and other expenses.

150.     The *Boettcher* claimants are seeking damages from Pulte for property damage arising out of and/or resulting from the Defendants' named insured subcontractors' work on the Project. If the homeowner-claimants in *Boettcher* are successful in obtaining an award against Pulte, Pulte will have incurred liability arising out of and/or resulting from the work of the Defendants' named-insured subcontractors.

151.     Pulte tendered its defense and indemnity of the *Boettcher* Claim to each of the Defendant insurers under the insurance policies listed herein.

152.     The Defendants rejected—or otherwise failed to respond to—Pulte's tenders for defense and indemnity of the *Boettcher* Claim, leaving Pulte with substantial unreimbursed defense costs.

153.     Pursuant to the insurance policies issued by the Defendants to their respective named-insured subcontractors, as specified herein, the Defendants owe a duty to pay all of the

defense fees and costs that Pulte incurred and will continue to incur in defending against the *Boettcher* Claim.

154. Pursuant to the insurance policies issued by the Defendants to their respective named-insured subcontractors, as specified herein, the Defendants have a duty to indemnify Pulte for any liability Pulte incurs as a result of the *Boettcher* Claim for property damage that arises out of and/or that is caused in whole or in part by the Defendants' respective named insured subcontractors' work.

155. The Defendants breached their duties by refusing to defend Pulte. On information and belief, Defendants misrepresented policy provisions and/or material facts related to coverage, failed to make prompt payment of Pulte's demands for reimbursement of its defense costs, and/or otherwise failed to respond to Pulte's tender of its defense of the *Boettcher* Claim. As a result of Defendants' conduct, Pulte has been and will be forced to expend significant resources defending itself against the *Boettcher* Claim. Pulte has incurred fees and costs in excess of $75,000 defending against the *Boettcher* Claim, and Pulte will continue to incur additional fees and costs defending the claim, which is ongoing.

156. Upon information and belief, the Defendants failed to investigate or timely respond to Pulte's tender of defense and indemnity, if they responded at all.

157. Upon information and belief, the Defendants failed to consider the allegations in the pleadings, facts provided by Pulte, or facts easily discernable.

158. Pleading further and in the alternative, in addition to these specific allegations based on insurance policy endorsements directly adding Pulte as an additional insured to each policy issued by the Defendants and listed herein, each policy listed herein above contained a provision or provisions the effect of which is to allow Pulte to stand in the shoes of the Defendants' named-insured subcontractors for purposes of coverage.

159.    The above is not an exclusive list of the Defendants' potential liability to Pulte as other theories of potential coverage and recovery may be apparent based on the specific policies and/or specific actions of each Defendant.

## FIRST CAUSE OF ACTION

### Declaratory Judgment
(By Pulte Against All Defendants)

160.    Pulte realleges the allegations contained in paragraphs 1 through 159 inclusive, and incorporates them by reference as though fully set forth herein.

161.    Pulte is named as an additional insured or is a known third-party beneficiary of each of the insurance policies issued by the Defendants listed herein.

162.    Under N.M.S.A. (1975), § 44-6-4, "[a]ny person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." N.M.S.A. (1975), § 44-6-4.

163.    Therefore, under N.M.S.A. (1975), § 44-6-4, Pulte seeks a judicial resolution of the controversy and a declaration of the following:

i. Pulte is an additional insured under the Defendants' policies listed herein based on specific endorsements to the policy and/or the insured contracts between Pulte and the Defendants' named-insured subcontractors;

ii. The Defendants have a duty to fully defend Pulte that was triggered by the allegations in the underlying complaint, facts brought to the Defendants' attention, or through facts that could have been acquired through a reasonable investigation;

iii. The Defendants' must indemnify Pulte for damages arising out of the work or operations of Defendants' named-insured subcontractors.

## SECOND CAUSE OF ACTION

### Breach of Contract
(By Pulte Against All Defendants)

164.   Pulte realleges the allegations contained in paragraphs 1 through 163, inclusive, and incorporates them by reference as though fully set forth herein.

165.   Pulte requested that Defendants defend Pulte against the *Boettcher* Claim under the insurance policies each of the Defendants issued to their respective named-insured subcontractors, as described more fully above. Pulte has performed all obligations owing under each of the policies in connection with its tender of defense, and Pulte has satisfied all relevant conditions precedent.

166.   Defendants have failed to discharge their contractual duties to defend Pulte against the *Boettcher* Claim. More particularly, Defendants: (1) breached their contracts by failing to promptly respond to Pulte's tenders, if they responded at all; (2) breached their contracts by refusing to provide Pulte with a defense; and (3) breached their contracts by refusing to fully investigate Pulte's tender.

167.   As a direct and proximate result of Defendants' conduct as alleged in this Complaint, Pulte has been damaged and will continue to be damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Breach of Contract on Direct Action as Indemnitee Under an "Insured Contract"
(By Pulte Against All Defendants)

168.   Pulte realleges the allegations contained in paragraphs 1 through 167, inclusive, and incorporates them by reference as though fully set forth herein.

169.     Pleading further and in the alternative, Pulte has direct rights as an additional insured under the Defendants' policies listed herein.

170.     However, Pulte is also entitled to recover defense and indemnity costs in the *Boettcher* Claim by standing in the shoes of the Defendants' named-insured Subcontractors.

171.     Pulte is entitled to be indemnified and defended from each of the Defendants' named-insured subcontractors listed herein, pursuant to clear provisions in the contracts between Pulte and the Defendants' named-insured subcontractors.

172.     The policies issued by the Defendants provide defense and indemnity for contractual liability arising from their respective Named Insured Subcontractors' work assumed in an "insured contract".

173.     The Defendants' named-insured subcontractors' contracts with Pulte are "insured contracts" within the definitions set out in the Defendants' policies.

174.     Because Defendants' named-insured subcontractors owe defense and indemnity to Pulte under their contracts and the Defendants owe defense and indemnity to their named insured subcontractors for liability assumed in an "insured contract," under New Mexico law, Pulte can recover directly from the Defendants for their named-insured subcontractors' liability under the indemnity and defense provision of the contract. *See Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 45, 139 N.M. 274 (holding that "a potential indemnitee under an insured contract, …can reasonably claim to stand in the shoes of [the] insured.")

## FOURTH CAUSE OF ACTION

### (Violation of the New Mexico Unfair Insurance Practice Act)
(By Pulte Against All Defendants)

175.     Pulte realleges the allegations contained in paragraphs 1 through 174, inclusive, and incorporates them by reference as though fully set forth herein.

176.     Section 59A-16-l, et seq. NMSA, prohibits certain insurance practices.

177.    The Unfair Insurance Practices Act does not limit its availability to the named insured. *See* NMSA § 59A-16-30; *Hovet v. Allstate Ins. Co*., 2004-NMSC-010, ¶ 16, 135 N.M. 397.

178.    By denying coverage to Pulte as an additional insured, each of the Defendants have violated New Mexico law by, including without limitation, the following:

> a. failing to adopt and implement reasonable standards for the prompt investigation and processing of insured's claims arising under policies;
>
> b. not attempting in good faith to effectuate prompt, fair, and equitable settlements of an insured's claims in which liability has become reasonably clear;
>
> c. misrepresenting the benefits, advantages, conditions, or terms of any policy; and
>
> d. failing to disclose material facts reasonably necessary to prevent other statements made from being misleading.

179.    As a result of the Insurance Defendants' actions and breaches, Pulte has suffered damages including but not necessarily limited to incurring attorneys' fees and other costs of defense in the above described matters.

## FIFTH CAUSE OF ACTION

### (Bad Faith)
#### (By Pulte Against All Defendants)

180.    Pulte realleges the allegations contained in paragraphs 1 through 178, inclusive, and incorporates them by reference as though fully set forth herein.

181.    Each of the Defendants owes duties to act honestly and in good faith with its insureds and to reasonably conduct a timely and fair investigation and evaluation of claims.

182.    Each of the Defendants failed to timely investigate and properly evaluate Pulte's tender of its defense and indemnity of the *Boettcher* Claim, which is unreasonable under the

circumstances and constitutes bad faith breaches of their duties to act honestly and in good faith and to reasonably conduct a timely and fair investigation and evaluation of Pulte's claims.

183.    Each of the Defendants have unreasonably delayed and/or denied Pulte's request for defense and indemnity, including but not limited to failing and refusing to provide an immediate, full and complete defense to Pulte.

184.    Such conduct constitutes bad faith breaches that warrant compensatory damages.

185.    Furthermore, each of the Insurance Defendants' reasons for delay and/or denial of Pulte's claims are frivolous and unfounded.

186.    The conduct of the Insurance Defendants constitutes bad faith, malicious, willful, reckless, and wanton conduct warranting an award of punitive damages.

## <u>PRAYER</u>

WHEREFORE, Pulte prays for judgment against Defendants as follows:

1.    **<u>FIRST CAUSE OF ACTION</u>**:

    a.    For declaratory relief as described above;

    b.    For all costs and expenses at the full extent permitted by law;

    c.    For pre-judgment interest and post-judgment interest at the full extent permitted by law;

    d.    For attorneys' fees to the extent recoverable by applicable law; and

    e.    For such other and further relief as the Court deems fair and proper.

2.    **<u>SECOND CAUSE OF ACTION</u>**:

    a.    For general and specific damages in an amount to be proven at trial;

    b.    For punitive damages at the full extent permitted by law;

    c.    For all costs and expenses at the full extent permitted by law;

    d.    For pre-judgment interest and post-judgment interest at the full extent permitted by law;

e.      For 18% per annum of the amount of Pulte's claim;

f.      For attorneys' fees to the extent recoverable by applicable law, which shall be taxed against the Defendants as costs, and

g.      For such other and further relief as the Court deems fair and proper.

3.   **THIRD CAUSE OF ACTION**:

a.      For general and specific damages in an amount to be proven at trial;

b.      For punitive damages at the full extent permitted by law;

c.      For all costs and expenses at the full extent permitted by law;

d.      For pre-judgment interest and post-judgment interest at the full extent permitted by law;

e.      For 18% per annum of the amount of Pulte's claim;

f.      For attorneys' fees to the extent recoverable by applicable law, which shall be taxed against the Defendants as costs, and

g.      For such other and further relief as the Court deems fair and proper.

4.   **FOURTH CAUSE OF ACTION**:

a.      For general and specific damages in an amount to be proven at trial;

b.      For punitive damages at the full extent permitted by law;

c.      For all costs and expenses at the full extent permitted by law;

d.      For pre-judgment interest and post-judgment interest at the full extent permitted by law;

e.      For 18% per annum of the amount of Pulte's claim;

f.      For attorneys' fees to the extent recoverable by applicable law, which shall be taxed against the Defendants as costs, and

g.      For such other and further relief as the Court deems fair and proper.

/ / /

PLAINTIFF'S COMPLAINT

5.　　**FIFTH CAUSE OF ACTION**:

a.　　For general and specific damages in an amount to be proven at trial;

b.　　For punitive damages at the full extent permitted by law;

c.　　For all costs and expenses at the full extent permitted by law;

d.　　For pre-judgment interest and post-judgment interest at the full extent permitted by law;

e.　　For 18% per annum of the amount of Pulte's claim;

f.　　For attorneys' fees to the extent recoverable by applicable law, which shall be taxed against the Defendants as costs, and

g.　　For such other and further relief as the Court deems fair and proper.


DATED: August 21, 2023　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　PAYNE & FEARS LLP



　　　　　　　　　　　　　　　　　　　_/s/ Sarah J. Odia_
　　　　　　　　　　　　　　　　Scott S. Thomas, Bar No. 21-275
　　　　　　　　　　　　　　　　Sarah J. Odia, Bar No. 21-279
　　　　　　　　　　　　　　　　PAYNE & FEARS LLP
　　　　　　　　　　　　　　　　4 Park Plaza, Suite 1100
　　　　　　　　　　　　　　　　Irvine, California 92614
　　　　　　　　　　　　　　　　Phone (949) 851-1100
　　　　　　　　　　　　　　　　Fax (949) 851-1212
　　　　　　　　　　　　　　　　Emails: sst@paynefears.com
　　　　　　　　　　　　　　　　　　　　sjo@paynefears.com

　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

PLAINTIFF'S COMPLAINT

## JURY DEMAND

Plaintiffs PULTE HOMES OF NEW MEXICO, INC. and PULTE DEVELOPMENT

NEW MEXICO, INC. hereby demand a trial by jury.

DATED: August 21, 2023
Respectfully submitted,
PAYNE & FEARS LLP


*/s/ Sarah J. Odia*
Scott S. Thomas, Bar No. 21-275
Sarah J. Odia, Bar No. 21-279
PAYNE & FEARS LLP
4 Park Plaza, Suite 1100
Irvine, California 92614
Phone (949) 851-1100
Fax (949) 851-1212
Emails: sst@paynefears.com
        sjo@paynefears.com

Attorneys for Plaintiffs